UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RASHAD AHMAD REFAAT EL BADRAWI | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:07-cv-372 (JCH) |
| | : | |
| DEPARTMENT OF HOMELAND | : | |
| SECURITY, ET AL., | : | SEPTEMBER 30, 2008 |
| Defendants | : | |

**RULING ON DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT [Doc. Nos. 15, 20, 25, 39, 57]**

This action is brought under the Freedom of Information Act ("FOIA"), 5 U.S.C.

§ 552. Plaintiff, Rashad Ahmad Refaat El Badrawi, seeks declaratory and injunctive

relief to compel disclosure of records held by the defendants, the Department of

Homeland Security ("DHS"), the Department of State ("DOS"), and the Department of

Justice ("DOJ").

On October 19, 2006, El Badrawi submitted FOIA requests to three component

agencies of DHS–Customs and Border Protection ("CBP"), Citizenship and Immigration

Services ("CIS"), and Immigration and Customs Enforcement ("ICE")–as well as DOS,

the Federal Bureau of Investigation ("FBI") (a component of DOJ), and the Employment

and Training Administration ("ETA") (a component of the Department of Labor). Each

agency responded to El Badrawi individually. On March 9, 2007, El Badrawi initiated

the current action, alleging that the agencies had been largely unresponsive to his

requests for records. In November 2007, El Badrawi dropped his claim against ETA.

The five remaining defendants, CBP, DOS, FBI, ICE, and CIS, have each filed a

Motion for Summary Judgment. See Doc. Nos. 15, 20, 25, 39, and 57. Specifically, the

1

defendants seek summary judgment with respect to: 1) the adequacy of the agencies' searches; 2) the reasonableness of the referral of documents to their originating agencies for direct review and response; 3) the propriety of the withholding of certain records and the propriety of the exemptions invoked to justify those withholdings; and 4) the reasonableness of the agencies' segregability determinations. For the reasons that follow, the Motions are **GRANTED** in part and **DENIED** in part.

## I.   STANDARD OF REVIEW

The Freedom of Information Act is "broadly conceived to reflect a general philosophy of full agency disclosure." <u>ACLU v. DOD</u>, No. 06-3140-cv (2d Cir. Sept. 22, 2008) (internal quotations omitted). In other words, "[the Act] adopts as its most basic premise a policy strongly favoring public disclosure of information in the possession of federal agencies." <u>Halpern v. FBI</u>, 181 F.3d 279, 286 (2d Cir. 1999). It ". . . was enacted to promote honest and open government and to assure the existence of an informed citizenry . . . ." <u>Grand Cent. P'ship., Inc. v. Cuomo</u>, 166 F.3d 473, 478 (2d Cir. 1999). There are, however, limits to FOIA's reach. Specifically, "[i]n recognition of those interests that may at times conflict with [the] policy of full disclosure, FOIA also provides nine exemptions from its disclosure requirement . . . ." <u>Halpern</u>, 181 F.3d at 287. Yet, "[i]n keeping with the policy of full disclosure, the exemptions are narrowly construed with doubts resolved in favor of disclosure." <u>Id.</u> (internal quotations omitted).

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256

(1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).

"In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to FOIA." Carney v. United States Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994). "Affidavits . . . supplying facts indicating that the agency has conducted a thorough search and giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." Id.

"Affidavits submitted by an agency are accorded a presumption of good faith, . . . [and] accordingly, discovery relating to the agency's search and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are adequate on their face." Id. (internal quotations omitted). "When this is the case, the district court may forgo discovery and award summary judgment on the basis of affidavits." Id. (internal quotations omitted). As the Second Circuit has noted, however, ". . . the good faith presumption that attaches to agency affidavits only applies when accompanied by reasonably detailed explanations of why material was withheld." Halpern, 181 F.3d at 295.

Finally, FOIA instructs district courts to review de novo agency decisions to withhold records. 5 U.S.C. § 552(a)(4)(B). The de novo standard of review for FOIA cases is well established in this circuit. See, e.g., Halpern, 181 F.3d at 288; Massey v. FBI, 3 F.3d 620, 622 (2d Cir. 1993); Hopkins v. United States Dep't of Hous. & Urban Dev., 929 F.2d 81, 84 (2d Cir. 1991).

II.    **FACTUAL BACKGROUND**[1]

A.    Plaintiff's Arrest, Detention, and Voluntary Departure

El Badrawi is a foreign national who studied and worked lawfully in the United States for nearly eleven years.  Declaration of Rashad Ahmad Refaat El Badrawi ("El Badrawi Decl.") at ¶¶ 1-2.  He worked primarily in the biotechnology industry.  Id. at ¶ 2.  On May 26, 2003, DOS issued El Badrawi an H1-B non-immigrant visa authorizing him to enter the United States and accept employment at the University of Connecticut ("UCONN") Health Center in Hartford, Connecticut.  From June 2003 to October 2004, El Badrawi was employed at the UCONN Health Center as a research associate in the Richard D. Berlin Center for Cell Analysis and Modeling.  Unknown to El Badrawi or his employer, however, DOS had administratively revoked his visa on October 2, 2003.  Id. at ¶ 7; Exhibit 12 to Plaintiff's Memorandum in Opposition to FBI's Motion for Summary Judgment ("Plaintiff's Mem. in Opp. to FBI").  By the terms of the certificate of revocation, the revocation was effective only upon El Badrawi's departure from the United States.  Id.  El Badrawi did not leave the United States between June 2003 and his eventual removal, and therefore he had no indication that his visa had been revoked.  El Badrawi Decl. at ¶ 8.

On October 29, 2004, El Badrawi was arrested in the parking lot of his Hartford residence by officers from Immigration and Customs Enforcement ("ICE"), an investigative branch of DHS.  Id. at ¶ 11.  He was subsequently detained at the Hartford

_____

[1]For the purposes of the instant motions, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the plaintiff where there is evidence to support his allegations.

4

Correctional Center where he was placed in the general population of inmates.  Id. at ¶ 12.

Due to harsh detention conditions[2] and fearful that he had been falsely linked with national security concerns, El Badrawi felt he had no choice but to accept voluntary departure from the United States.  Id. at ¶ 13.  On November 10, 2004, he accepted voluntary departure.  Rather than being released, however, El Badrawi was imprisoned at the Hartford Correctional Center for an additional 42 days.  Id. at ¶¶ 14-15.  On December 22, 2004, ICE officers finally took El Badrawi to John F. Kennedy International Airport in Queens, New York and placed him on a flight out of the United States.  Id. at ¶ 16.

In January 2005, El Badrawi met with officials at the United States Embassy in Beirut, Lebanon to discuss his visa revocation.  Id. at ¶ 17.  Embassy officials did not provide El Badrawi with any specific information regarding his treatment.  Id. at ¶ 17.  To date, he has not received any specific information from any source regarding the reasons for his visa revocation, arrest, or removal.  Id. at ¶ 18.

B.    El Badrawi's FOIA Requests and Defendant's Responses

1. CBP

On October 19, 2006, El Badrawi filed a FOIA request with CBP seeking access to, and copies of, any records held by CBP mentioning or concerning himself.  See Plaintiff's Mem. in Opp. to CBP at 3.  El Badrawi noted in this initial FOIA request that there was at least one known alternative spelling of his name.  Exhibit B to CBP's Local

---

[2]Among other things, El Badrawi claims he was denied medication for his Crohn's disease and denied the ability to observe Ramadan for the first week of his detention.

Rule 56(a)1 Statement of Material Facts Not in Dispute ("CBP 56(a)1 Stmt").

In responding to plaintiff's request, CBP located eight records mentioning El Badrawi in its Treasury Enforcement Communications System ("TECS") database, but determined that all eight records belonged to other agencies. Suzuki Decl. at ¶ 7. As a result, on December 9, 2006, CBP issued a response to El Badrawi, stating that it was "unable to locate any records in the [CBP] database within the releasing authority of CBP." Exhibit C to CBP 56(a)1 Stmt.

On December 20, 2006, El Badrawi appealed CBP's response. Exhibit D to CBP 56(a)1 Stmt. Due to administrative error, CBP misplaced the appeal. Suzuki Decl. at ¶ 8. CBP later located the appeal and began processing it on March 21, 2007. Id. at ¶ 8.

In response to El Badrawi's appeal, CBP reversed its initial decision and determined that one of the eight documents was a responsive CBP record. CBP provided that document to El Badrawi in redacted form on July 9, 2007. Exhibit E to CBP 56(a)1 Stmt. CBP confirmed that the other seven documents located during the initial search were not CBP records, and thus should be referred to the originating agencies for determinations as to their releasability. Suzuki Decl. at ¶ 9. Of these, two records were referred to DOS, and three were referred to ICE. Id. at ¶ 9. The remaining two documents were later determined to be CBP documents and released in part to El Badrawi on December 18, 2007. Id. at ¶ 11.

Subsequently, on January 4, 2008, CBP received from ICE six CBP records responsive to plaintiff's request containing variations in the spelling of El Badrawi's name. Supp. Suzuki Decl. at ¶ 7. Noting the variant spellings–apparently for the first time–CBP conducted another search of its TECS database and discovered another

6

eight responsive records.  Id. at ¶ 11.  These fourteen additional records were released to El Badrawi on January 15, 2008.  Id. at ¶ 12.  Thirteen were released in part; one in full.  Id., Attachment A.

    2.  DOS

On October 19, 2006, El Badrawi submitted a FOIA request to DOS seeking, inter alia, "[a]ny record concerning the revocation of Mr. Badrawi's H1-B visa on October 2, 2003."  Plaintiff's Mem. in Opp. to DOS at 4.  By letter dated December 1, 2006, defendant acknowledged receipt of the request.  Id.  El Badrawi brought the instant claim on March 9, 2007, after having received no records from DOS.

In a letter dated March 21, 2007, DOS informed El Badrawi that it had located 37 relevant documents totaling 57 pages.  DOS Memorandum in Support of Motion for Summary Judgment ("DOS Mem.") at 4.  DOS further advised El Badrawi that, of the 37 documents, two were being released in full, four released in part, and 30 withheld in full.  The letter also noted that one document had originated with another agency and had been forwarded to that agency for a response.  Id. at 4.  This statement was erroneous, however, as the document in question was actually released in full to El Badrawi with the March 21 letter (this error was communicated to El Badrawi by letter on December 18, 2007).  Id. at 6-7.

Subsequently, by letter dated March 26, 2007, DOS informed El Badrawi that it had located an additional seven responsive documents in the Central Foreign Policy Records database, and that all seven documents were being withheld in full.  Id. at 4.

Finally, two other documents retrieved by DOS were forwarded to another agency for its review.  Declaration of Margaret Grafeld ("Grafeld Decl.") at ¶ 24.  It was

determined by the unnamed originating agency that the documents were to be withheld in full. Supplementary Declaration of Margaret Grafeld ("Supp. Grafeld Decl.") at ¶ 4. This determination was communicated to El Badrawi in a letter from DOS on September 9, 2008. Id.

El Badrawi appealed the DOS withholdings and the adequacy of the DOS search in letters dated April 2, 2007 and April 3, 2007. Id. at 5. Both appeals were denied by DOS in a December 4, 2007 letter. Id. Finally, by separate letter on December 4, DOS advised El Badrawi that all searches–including a search of the United States Embassy in Damascus–had been completed, and that no additional responsive documents had been found. Id.

    3. FBI

By letter dated October 19, 2006, El Badrawi submitted a FOIA request to the FBI for "any record held by the [FBI] mentioning or concerning" himself. Plaintiff's Mem. in Opp. to FBI at 5. On November 21, 2006, the FBI responded by letter, informing El Badrawi that "a search of the automated indices to the Central Records System at FBIHQ located no records responsive to [El Badrawi's] FOIA request . . . ." FBI Mem. at 3. El Badrawi appealed this determination by letter dated December 11, 2006. Id. On January 11, 2007, the FBI acknowledged receipt of El Badrawi's administrative appeal. Id. at 3-4. El Badrawi commenced the instant action on March 9, 2007, after which the FBI informed El Badrawi that it was closing his appeal due to the court proceedings, in accordance with 28 C.F.R § 16.9(a)(3). Id. at 4.

On April 19, 2007, the FBI filed an Answer to El Badrawi's Complaint (Doc. No. 7). In the Answer, the FBI stated that "the 'no records' response which, was provided in

administrative error to plaintiff, . . . was incorrect.  FBI's policy under FOIA is to neither

confirm nor deny the existence of records responsive to the type of request made by

plaintiff."[3]  Def. Ans. at 10.  In separate litigation, however, the federal government

confirmed the existence of at least one FBI record responsive to El Badrawi's FOIA

request.  Plaintiff's Mem. in Opp. to FBI at 6.  Specifically, in El Badrawi v.

Commissioner, State of Connecticut, Department of Corrections, Docket No. FIC 2007-

136, United States Attorney Kevin O'Connor ("O'Connor") submitted a Statement of

Interest on July 18, 2007 confirming the existence of a "data sheet from the National

Crime Information Center ('NCIC'), a database operated by the [FBI], in connection with

the pre-deportation detention of [El Badrawi] at the Hartford Correctional Center."  Id.

Having received confirmation of the existence of at least one NCIC record, El

Badrawi submitted a follow-up FOIA request to the FBI on November 19, 2007,

specifically requesting the NCIC record at issue.  Id.  In the same letter, El Badrawi

informed the FBI that he had received a record from ICE confirming that the FBI had

"participated in [El Badrawi's] arrest and subsequent interview" pursuant to Operation

Frontline.[4]  Id. at 7.  Consequently, El Badrawi also specifically requested records

pertaining to the FBI's investigation of him under Operation Frontline.  Id.

In a letter dated December 4, 2007, the FBI acknowledged the existence of the

---

[3]A refusal to confirm or deny the existence of records by a government agency is known as a Glomar response.  See Phillippi v. CIA, 655 F.2d 1325, 1328 (D.C. Cir. 1981).

[4]ICE initiated Operation Frontline to pursue information it obtained from a variety of sources, including confidential informants, relating to criminal and/or terrorist activity that had national security implications.  Declaration of Gloria Marshall ("Marshall Decl.") at ¶ 44.  Specifically, Operation Frontline sought to uncover and disrupt unlawful activity intended to disturb the 2004 presidential election.  Id. Under Operation Frontline, ICE investigated and later arrested a large number of subjects, including El Badrawi.  Id. at ¶ 45.

NCIC data sheet referenced by O'Connor, but "denie[d] that the existence of this NCIC data sheet either confirms or denies the existence of records regarding [El Badrawi]."[5] Id.  The FBI also stated that it "continues to assert its <u>Glomar</u> response to plaintiff's FOIA request."  Id.

Later, by letter dated January 15, 2008, the FBI released to El Badrawi five pages of records, in redacted form, responsive to his original FOIA request.  Id.  These five pages consisted of two "cross-reference" files from the FBI's Central Records System ("CRS"), containing mere mention or reference to El Badrawi in a record located in a separate "main" file on a different subject matter.  Id.

To date, the FBI has not released any NCIC record concerning El Badrawi or any record regarding the Operation Frontline investigation of him.  Id.  It has informed El Badrawi that of the NCIC's 18 computerized database files, no records related to El Badrawi exist in 17 of the databases.  Declaration of Kimberly J. Del Greco ("Del Greco Decl.") at 6.  The FBI refuses to confirm or deny that any responsive records are contained in the NCIC's Violent Gang and Terrorist Organization File ("VGTOF").

4. ICE

By letter dated October 19, 2006, El Badrawi submitted a FOIA request to ICE for all records "mentioning or concerning" himself.  Plaintiff's Mem. in Opp. to ICE at 3. ICE had not begun processing El Badrawi's request when this action was commenced on March 9, 2007.  ICE Mem. at 5.

---

[5]It was the FBI's contention at oral argument that the NCIC document referenced in O'Connor's Statement of Interest is merely a stock printout generated anytime NCIC is searched.  In other words, the mere existence of an NCIC data sheet only proves that an NCIC search for a certain individual was conducted, not necessarily that the NCIC contains records concerning that individual.

In connection with another lawsuit,[6] in July, 2007, ICE released a number of records from its investigative file on El Badrawi and its Treasury Enforcement Communications System ("TECS"), including one document in full and 36 documents with redactions. Id. at 7. ICE also withheld ten responsive documents in full at that time. Id.

After receiving a second letter from El Badrawi in November 2007, requesting a more complete response, ICE searched a second database, and located an additional nine responsive records. Id. Shortly thereafter, ICE received 21 pages of responsive documents from the Hartford Correctional Center. Id. at 8. In December 2007, ICE also conducted a search for records related to El Badrawi's Visa-Revocation Action Lead Referral ("ALR"), and to a March 2004 interview of El Badrawi by ICE officials pursuant to the ALR. Id. These searches yielded additional responsive records, id., as did a search for e-mails relating to El Badrawi, id. at 9.

Consequently, on December 14, 2007, ICE released to El Badrawi an additional 13 documents in full and 29 documents with redactions. Id. It withheld, at that time, 10 documents in their entirety. Id.

_____

[6]Lowenstein v. DHS, No. 3:06-cv-1889 (MRK) (D.Conn.), filed November 21, 2006. Lowenstein involves a request made by the Allard K. Lowenstein International Human Rights Clinic National Litigation Project ("the Lowenstein clinic"), a clinical program at Yale Law School, for records regarding Operation Frontline. In that case, the plaintiffs and ICE signed a stipulation on April 20, 2007, which set forth the dates by which ICE would respond to the Lowenstein clinic with regard to certain categories of records related to Operation Frontline. ICE Mem. at 6. ICE maintains that the "overlap of responsive documents between [El Badrawi's request] and Lowenstein resulted in some uncertainty and delay, though without ultimately compromising the completion of the search for and processing of records responsive to [El Badrawi's] FOIA request in the instant case." Id. The plaintiff notes, however, that Lowenstein involves a different search request, made by different requesters (albeit through requests signed by the same counsel, Attorney Michael Wishnie), and further that ICE does not clarify why Lowenstein–one of thousands of FOIA requests pending before the agency–should have interfered with El Badrawi's request. Def. Mem. in Opp. to ICE at 4-5.

In January 2008, ICE referred 17 pages of responsive records to CBP.  Id.

Finally, on February 13, 2008, ICE released to El Badrawi 56 pages of records in full (including 10 that had previously been withheld in full) and 31 pages in redacted form.  Id. at 10.  It also withheld, at that time, 52 pages of records in full.  Id.

To date, ICE has located 227 pages of records responsive to El Badrawi's request.  Id. at 1.  Of this total, ICE has released to El Badrawi, over the course of numerous responses, 70 pages in full and 95 pages with redactions.  Id. at 1-2.  It has withheld 62 pages in full.  Id. at 2.

   5.  CIS

On October 19, 2006, El Badrawi submitted a FOIA request to CIS requesting "any record held by [CIS] mentioning or concerning [himself]."  CIS Mem. at 2.  After an initial general search of its Alien File/Central Index System (A-file/CIS), the CIS's National Records Center (NRC), located in Lee's Summit, Missouri, could not locate four responsive files it expected to find.  Id. at 3.  The files were for immigration transactions initiated by El Badrawi.  Id.  Further research revealed that three of the files were at CIS's Harrisonburg File Facility and that one was at CIS Headquarters in Washington, D.C.  Id.

The three receipt files from Harrisonburg were received by the NRC in April 2007, and processed along with a copy of El Badrawi's "alien file."  Id. at 4.  These files included 351 pages of responsive documents.  Id.  Of these, on April 18, 2007, CIS released to El Badrawi 270 pages in full and 45 pages in part.  Id.  CIS withheld 30 pages in full.  Id.  Six pages were referred to DOS.  Declaration of Brian J. Welsh ("Welsh Decl.") ¶ 13.

The fourth receipt file has not yet been located. CIS Mem. at 4.

On May 22, 2007, El Badrawi appealed CIS's decision to withhold certain information. Id. As a result of the appeal, on March 18, 2008, CIS fully released to El Badrawi two pages which had previously been released in redacted form, and released to El Badrawi information previously redacted from nine pages withheld in part. Id. Further, as a result of this appeal, CIS referred to DOS one page previously withheld in full, making a total of seven records referred to DOS. Id. Defendants' submissions are unclear as to the disposition of these seven documents.[7]

III.  **ANALYSIS**

A.  Adequacy of Agency Searches

All five agencies have moved for summary judgment on the adequacy of the searches they undertook in response to El Badrawi's FOIA requests. FOIA mandates that in responding to ". . . a request for records, an agency shall make reasonable efforts to search for the records . . . ." 5 U.S.C. § 552(a)(3)(C). To prevail on summary judgment when the adequacy of an agency's search is at issue, "the defending agency must show beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents." Morley v. CIA, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (internal quotations omitted).

"In adjudicating the adequacy of the agency's identification and retrieval efforts, the trial court may be warranted in relying upon agency affidavits." Id. at 1116 (citation omitted). The Second Circuit has adopted the D.C. Circuit position that such reliance is

_____

[7]At oral argument, DOS stated that the seven records it received from CIS were duplicates of DOS records already reviewed and adjudicated.

only appropriate, however, when agency affidavits are ". . . relatively detailed and nonconclusory, and submitted in good faith."  Grand Cent. P'ship., Inc. v. Cuomo, 166 F.3d 473, 488-9 (2d Cir. 1999) (citing SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991)).  In other words, "[a] district court in a FOIA case may grant summary judgment in favor of an agency on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith."  Id. at 478 (emphasis in Grand Cent. P'ship., Inc.) (internal quotations omitted).

The agencies have each submitted affidavits describing their respective searches.  The question before the court is whether these affidavits are "relatively detailed and nonconclusory, and submitted in good faith."  Id.  Because "[a]ffidavits submitted by an agency are accorded a presumption of good faith," Carney, 19 F.3d at 812, this court's initial inquiry necessarily focuses on whether the defendants' affidavits meet the "relatively detailed and nonconclusory" standard.

"A reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched, is necessary to afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment."  Tarullo v. United States DOD, 170 F. Supp. 2d 271 (D. Conn. 2001) (quoting Oglesby v. United States Dep't of Army, 920 F.2d 57, 67 (D.C. Cir. 1990)).

Affidavits should "'identify the searched files and describe at least generally the

structure of the agency's file system' which renders any further search unlikely to disclose additional relevant information." <u>Katzman v. CIA</u>, 903 F. Supp. 434, 438 (E.D.N.Y. 1995) (quoting <u>Church of Scientology v. IRS</u>, 792 F.2d 146, 151 (D.C. Cir. 1986), aff'd, 484 U.S. 9 (1987)).

Moreover, "[a]n affidavit from an agency employee responsible for supervising a FOIA search is all that is needed to satisfy Rule 56(e); there is no need for the agency to supply affidavits from each individual who participated in the actual search." <u>Carney</u>, 19 F.3d at 814. As <u>Carney</u> makes clear, however, the agency employee submitting an affidavit must have some personal involvement in supervising the FOIA search. <u>See</u> <u>id.</u> (noting that the employees who prepared the declarations in question "personally supervised [plaintiff's] requests and reviewed the withheld documents," and were "personally involved in processing [plaintiff's] requests").

Finally, it bears noting that, even if an agency has met its burden by submitting, in good faith, relatively detailed and nonconclusory affidavits, "the requester may nonetheless produce countervailing evidence, and if the sufficiency of the agency's identification or retrieval procedure is genuinely in issue, summary judgment is not in order." <u>Morley</u>, 508 F.3d at 1116. In other words, after the burden has shifted, "the plaintiff must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, or provide some tangible evidence that . . . summary judgment is otherwise inappropriate." <u>Carney</u>, 19 F.3d at 812.

1. <u>CBP</u>

_____In his October 19, 2006 FOIA request to CBP, El Badrawi sought "access to and copies of any record held by [CBP] mentioning or concerning [himself] . . . including but

not limited to any record found in the Treasury Enforcement Communications System (TECS), Interagency Border, National Automated Immigration Lookout System (NAILS), or Computer Linked Application Information Management System (CLAIMS) databases." Exhibit B to the Declaration of Shari Suzuki ("Suzuki Decl."). CBP moves for summary judgment as to the adequacy of the search it undertook in response to this request.

In support of its Motion for Summary Judgment (Doc. No. 15), CBP submitted the declaration of Shari Suzuki, Chief of CBP's Freedom of Information Act Appeals, Policy, and Litigation Branch ("FAPLB") in Washington, D.C.[8] Suzuki notes that as Chief, she is responsible for "overall supervision and management of the FAPLB," including, inter alia, the following responsibilities: "1) giving guidance and instructions to the personnel in CBP regarding the processing of FOIA requests; 2) adjudicating administrative appeals that concern FOIA requests; and 3) overseeing all CBP activities related to information disclosure." Suzuki Decl. at 1. Suzuki has held her current position since April 2, 2006. Id.

Suzuki states that she is "familiar with [El Badrawi's] request for information from CBP, pursuant to the FOIA," and that all information contained in her declaration is

---

[8]The original Suzuki declaration was filed concurrent with CBP's Motion for Summary Judgment on January 4, 2008. CBP filed a first supplemental Suzuki declaration on February 8, 2008, after CBP found additional responsive documents by searching for alternate spelling of El Badrawi's name. Supplemental Declaration of Shari Suzuki ("Supp. Suzuki Decl.") at 2. On September 12, 2008, in further support of its Motion for Summary Judgment, CBP filed a second supplemental Suzuki declaration and a declaration of Valerie Isbell, Executive Director, Passenger Systems Program Office (PSPO), Office of Information Technology (OIT), CBP. The purpose of the additional declarations was to "clarify" and "explain" to the court certain contradictions or ambiguities in the previous Suzuki declarations. Rather than clarifying or explaining, however, the additional declarations merely created new inconsistencies, making muddy waters even murkier. See Plaintiff's Response to CBP's Supplemental Declarations (Doc. No. 104).

based upon information furnished to her in her official capacity.  Id. at 2.  Suzuki avers

that the statements she makes in her declaration are based upon her personal

knowledge, which includes knowledge acquired through, and agency files reviewed in

course of, her official duties.  Id.  Regarding the search itself, Suzuki states that:

> CBP's record search in response to plaintiff's request comprised of searching records retained in the TECS system, a computer based telecommunications system containing investigative and law enforcement information pertaining to individuals, business, conveyances, and the importation and exportation of merchandise.  TECS is the principal information system supporting the border management and law enforcement mission of CBP and is the sole interface to the CBP records concerning the interaction of the CBP officers with persons entering the United States.  Further, it is the only database that would reasonably contain the information requested in [El Badrawi's] FOIA request.

Id. at 5.  Suzuki then provides a description of the types of records contained in TECS,

and concludes that "[a]ny and all information created by CBP regarding plaintiff would

be maintained in TECS."  Id.  The declaration continues:

> There are no other CBP records from NAILS or CLAIMS databases [the other databases specifically referenced in El Badrawi's FOIA request].  In January 2005, all data that was contained in NAILS database was merged into TECS, and NAILS ceased to exist.  Thus there are no NAILS records responsive to plaintiff's request. CLAIMS database is maintained by [CIS]; it is not a CBP system of records.  CBP has no access to search CLAIMS database; therefore, that database was not searched.

Id. at 6.

The Suzuki declaration is insufficient on two grounds.[9]  It fails to meet the

"relatively detailed and nonconclusory" standard because: 1) it does not "describe at

least generally the structure of the agency's file system" which renders any further

---

[9]The plaintiff claims CBP is not entitled to summary judgment on the adequacy of its search for numerous other reasons.  See Plaintiff's Mem. in Opp. to CBP at 13-22.  Because the declaration is insufficient on the two grounds discussed herein, it is unnecessary for the court to consider El Badrawi's other claims.

search unlikely to disclose additional relevant information, Church of Scientology v. IRS, 792 F.2d 146, 150 (D.C. Cir. 1986); Katzman, 903 F. Supp. at 438; and 2) because it does not justify searching only the TECS database.

First, it must be noted that this court, other courts in this Circuit, and the D.C. Circuit, have all held that affidavits describing a search "must detail files searched and the general scheme of the agency file system." Fisher v. FBI, 94 F. Supp. 2d 213, 218 n.2 (D. Conn. 2000); see also Church of Scientology v. IRS, 792 F.2d 146, 150 (D.C. Cir. 1986); Dinsio v. FBI, 445 F. Supp. 2d 305, 312 (W.D.N.Y. 2006); Rabin v. United States Dep't of State, CIA, 980 F. Supp. 116, 120 (E.D.N.Y. 1997). Without at least an elementary description of the general scheme of an agency's file system, a FOIA requester has no basis upon which to dispute an agency's assertion that "any further search [is] unlikely to disclose additional relevant information." Katzman, 903 F. Supp. at 438.

The Suzuki declaration does not contain such a description. It merely describes the TECS database–the database actually searched–and explains why two other databases referenced by El Badrawi's FOIA request were not searched.[10] It makes no attempt to describe the general scheme of CBP's file system. Such a description might include, for example, a list of databases to which CBP has access and a delineation of what types of records each database contains. The lack of such disclosure stymies El Badrawi's ability to advocate his position and does not meet the "relatively detailed and nonconclusory" standard adopted by the Second Circuit. Grand Cent. P'ship., Inc., 166

---

[10]El Badrawi does not contest the propriety of CBP's failure to search the NAILS and CLAIMS databases. Plaintiff's Mem. in Opp. to CBP at 15 n. 4.

F.3d at 489.

        In addition, the Suzuki declaration is insufficiently detailed because it fails to explain why CBP chose to search only the TECS database.  Suzuki's statements that "[TECS] is the only database that would reasonably contain the information requested in [El Badrawi's] FOIA request," Suzuki Decl. at 5, and that "[a]ny and all information created by CBP regarding plaintiff would be maintained in TECS," Id. at 6, are conclusory.  The declaration offers no detail to support these statements, other than a cursory description of the TECS database.  Further, in a declaration submitted on September 12, 2008 in support of CBP's Motion for Summary Judgment, Valerie Isbell notes that she, as Executive Director of CBP's Passenger Systems Programs Office (PSPO), "is responsible for the development and operational management of over 44 systems that support more than 70,000 users from over 20 Federal agencies that are responsible for traveler processing and border security services."  Isbell Decl. at 1.  Isbell gives no indication, however, that these 44 systems were searched, or in the alternative, that a decision was specifically taken not to search them.  CBP's failure to give detailed justifications for not searching these databases, and any other databases it may own or have access to, falls below the standard for "relatively detailed and nonconclusory" affidavits required to legitimate a summary judgment ruling.  Grand Cent. P'ship., Inc., 166 F.3d at 489.  Consequently, CBP has not met its burden of proving that it conducted a reasonable search as a matter of law.  Its Motion for Summary Judgment (Doc. No. 15) is denied as to the adequacy of its search.

        When agency affidavits and Vaughn indices fail to meet standards, a "district court will have a number of options for eliciting further detail from the government.  It

may require supplemental <u>Vaughn</u> affidavits or may permit appellant further discovery."

<u>Halpern</u>, 181 F.3d at 295. When the courts have permitted discovery in FOIA cases, it

is generally limited to the scope of the agency's search. <u>See</u> <u>Weisberg v. DOJ</u>, 627

F.2d 365, 371 (D.C. Cir. 1980). Further, courts have consistently held that "a court

should not, of course, cut off discovery before a proper record has been developed; for

example, where the agency's response raises serious doubts as to the completeness of

the agency's search, where the agency's response is patently incomplete, or where the

agency's response is for some other reason unsatisfactory." <u>Exxon Corp. v. FTC</u>, 466

F. Supp. 1088, 1094 (D.D.C. 1978). The court finds that CBP's response as to the

adequacy of its search is patently incomplete. Therefore, El Badrawi is permitted

limited discovery on this issue.

        2. <u>DOS</u>

On October 19, 2006, El Badrawi submitted a FOIA request to DOS seeking:

> Access to and copies of . . . any record held by [DOS] mentioning or concerning
> [himself] . . . including but not limited to: 1) any record concerning the issuance of
> Mr. El Badrawi's H1-B Visa on December 29, 1999; 2) any record concerning the
> issuance of Mr. El Badrawi's H1-B Visa in May of 2003; 3) any record concerning
> the issuance of any other Visa to Mr. El Badrawi; 4) any record concerning the
> revocation of Mr. El Badrawi's H1-B visa on October 2, 2003; 5) any record
> concerning Mr. El Badrawi's purported ineligibility to receive a visa under Section
> 212(a)(3) of the Immigration & Nationality Act; and 6) any record concerning Mr. El
> Badrawi found in the Consular Lookout and Support System (CLASS), National
> Security Entry/Exit Registration System (NSEERS), Consolidated Consular
> Database (CCD), or TIPOFF databases.

Exhibit 1 to Declaration of Margaret P. Grafeld ("Grafeld Decl."). DOS moves for

summary judgment as to the adequacy of the search it undertook in response to this

request.

In support of its Motion for Summary Judgment (Doc. No. 20), DOS submitted

the declaration of Margaret P. Grafeld, DOS's Information and Privacy Coordinator and Director of DOS's Office of Information Programs and Services ("IPS"). Grafeld states that she is "the [DOS] official immediately responsible for responding to requests under [FOIA], the Privacy Act . . . and other applicable records access provisions." Id. at 1. Grafeld further avers that she "makes [the statements contained in the declaration] based upon [her] personal knowledge, which in turn is based on a personal review of the records in the case file established for the processing of [El Badrawi's] request, and upon information furnished to [her] in the course of [her] official duties." Id. at 2. She notes that she has "read the complaint filed by [El Badrawi], and [is] familiar with the efforts of [DOS] personnel to process the . . . request." Id.

With regard to the search itself, Grafeld states that DOS's "search for records responsive to [El Badrawi's] request was designed to uncover all responsive records. When a FOIA request is received, IPS evaluates the request and determines which offices, overseas posts, or other records systems within [DOS] may reasonably be expected to contain the information requested. This determination is based on the description of records set forth in the request letter." Id. at 8.

"In [El Badrawi's] case," Grafeld continues, "IPS conducted a search of the Central File that was intended to identify any documents relating to [El Badrawi]." Id. at 9. She notes that "the Central File is [DOS's] most comprehensive and authoritative compilation of documents [and] it is by far the most frequently searched in response to FOIA requests." Id. In paragraph 16, Grafeld describes the Central File. Id. at 8. Grafeld also states that:

In addition to the Central File, [DOS] has decentralized records systems maintained

in the Department's domestic offices and at foreign service posts overseas. These records generally are concerned with specialized and unique activities and programs of the Department rather than with general foreign policy issues. Decentralized records systems include, among other things, personnel, security, medical and consular records.

Id. at 10. "In this case," she notes, "based on the information provided by plaintiff, in addition to the search of the Central File described above, searches were also conducted of the records maintained by the Office of Visa Services, the American Embassy in Damascus, and the Bureau of Intelligence and Research." Id. at 11. Grafeld provides descriptions of these three additional searches, including the types of documents typically maintained by each office, the databases searched, and the search methods used. Id. at 11-13.

The Grafeld declaration is insufficient, however, in that it does not address records maintained by the American Embassy in Beirut, Lebanon, a DOS overseas post likely to contain records responsive to El Badrawi's request. DOS was on notice that the Embassy in Beirut is likely to contain responsive records for at least two reasons. First, on or about January 11, 2005, El Badrawi met with officials at the American Embassy in Beirut to discuss why his H1-B Visa had been revoked. Badrawi Decl. ¶ 17. DOS was aware of this visit, and this visit likely resulted in the creation of records.[11] Second, at least three documents generated by DOS in response to El Badrawi's FOIA request contained telegrams or portions of telegrams from the Embassy in Beirut to

_____

[11]Document E6, a four-page telegram from the Embassy in Beirut to DOS, was retrieved as part of DOS's initial search. Document E6 was dated January 12, 2005, one day after El Badrawi's visit to the Embassy. Grafeld Decl. at 28. In all likelihood Document E6 contains information regarding that visit, and thus DOS's careful review of every document would have alerted it to the existence of responsive records at Embassy Beirut. See id. at 34.

DOS headquarters.[12]  Grafeld Decl. at 26, 28.  These telegrams are not insubstantial–together they contain approximately seven pages of information withheld in full–and suggest that other records pertaining to El Badrawi may still be in Beirut.

Given the likelihood that the Embassy in Beirut holds responsive records, any declaration that does not address that Embassy does not meet the requisite level of detail.  DOS has not explained–by way of a relatively detailed affidavit–why its search is adequate without including the Embassy in Beirut.[13]  Because it lacks such an explanation, and it appears on the current record that the Embassy in Beirut should have been searched, DOS has not met its burden of proving that it conducted a reasonable search as a matter of law.  Therefore, its Motion for Summary Judgment is denied as to the adequacy of its search and El Badrawi is permitted limited discovery on this issue.

3.  FBI

By letter dated October 19, 2006, El Badrawi submitted a request for:

Access to and copies of any record held by the FBI mentioning or concerning [himself], including, but not limited to: 1) information contained in the National Crime Information Center (NCIC); 2) information relating to any investigation of a purported connection between [El Badrawi] and international terrorism; and 3) any other information provided to the [DOS] regarding [El Badrawi] prior to the revocation of his visa on October 2, 2003.

---

[12]Document V26 is a one-page report from a DOS visa database pertaining to El Badrawi and containing a portion of a telegram from the Embassy in Beirut to the DOS.  It was generated February 22, 2007, and withheld in full.  Grafeld Decl. at 26.  Document E6 is a four-page telegram dated January 12, 2005, from the Embassy in Beirut to DOS which was withheld in full.  Id. at 28.  Document E7 is a two-page telegram dated February 7, 2005, from the Embassy in Beirut to DOS which was withheld in full.  Id.

[13]At oral argument, DOS argued that a search of the Embassy in Beirut is unnecessary because the failure to find responsive records in Damascus demonstrates the futility of searching overseas posts.  The court finds this reasoning unpersuasive.  El Badrawi alleges that he met with DOS personnel in Beirut, not Damascus.

23

Exhibit A to the Declaration of David M. Hardy ("Hard Decl.").  The FBI moves for summary judgment as to the adequacy of the search it undertook in response to this request.

In support of its Motion for Summary Judgment (Doc. No. 25), the FBI submitted the declaration of David M. Hardy, Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), at FBI headquarters ("FBIHQ") in Washington, D.C.  In his declaration, Hardy states that he supervises "approximately 208 employees who staff a total of ten FBIHQ units and a field operational service center unit whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to [FOIA] . . . ."  Hardy Decl. at 2.  Hardy further states that "the statements contained in [his] declaration are based upon [his] personal knowledge, upon information provided to [him] in his official capacity, and upon conclusions and determinations reached and made in accordance therewith."  Id.  He also notes that "due to the nature of [his] official duties, [he is] familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of FOIA.  Specifically, [he] is aware of the treatment of the FOIA request of [El Badrawi] for access to records pertaining to himself at FBIHQ."  Id.

Regarding the FBI's search in response to El Badrawi's FOIA request, Hardy states that "the FBI has conducted a search reasonable [sic] designed to yield documents responsive to plaintiff's request directed to FBIHQ."  Id. at 9.  Specifically, Hardy avers that, "by letter dated November 21, 2006, FBIHQ advised [El Badrawi] that a search of the automatic indices to the Central Records System ("CRS") at FBIHQ

located no records responsive to his FOIA request . . . ." Id. at 3. Hardy goes on to explain that:

> This 'no records' response to [El Badrawi] was given due to the fact that [he] did not specifically ask for a search of 'cross-references' in his initial October 19, 2006 request. In the absence of a specific request for a search of 'cross-references' at the initial administrative level, the FBI's current policy is to search for and identify only 'main' files responsive to FOIA requests. The FBI identified no 'main' files responsive to [El Badrawi's] request. Subsequent to the filing of the complaint [in the instant case], the FBI conducted a second search of FBIHQ for records responsive to [El Badrawi's] request by searching the indices of the FBIHQ CRS for cross-references.

Id. n.3. Hardy then gives a detailed description of the CRS, the multiple interfaces used to access records in the CRS, and the terms used to search the CRS in response to El Badrawi's FOIA request. Id. at 4-8. Hardy concludes his explanation of the search by noting that, "[a]lthough all files can be accessed through the CRS, each field office is responsible for maintaining its own files which are retrieved by a search in the CRS. FOIA requesters are required to submit their requests directly to the field office(s) they believe possess responsive records."[14] Id. at 9.

The Hardy declaration is insufficient. It fails to meet the "relatively detailed and

---

[14]It bears noting that, on February 15, 2008, El Badrawi submitted FOIA requests to the FBI field offices in Boston, Massachusetts and New Haven, Connecticut. He received a "no records" response from Boston, which he subsequently appealed. On appeal, the "no records" response was confirmed. See Supplemental Declaration of Sameer Ahmed in Support of Plaintiff's Response to FBI's Motion for Summary Judgment (Doc. No. 85). In a letter dated September 17, 2008, the FBI informed El Badrawi that it had located 50 responsive records in its New Haven field office. See Plaintiff's Response to Declaration of Kimberly J. Del Greco (Doc. No. 103) at 2. The FBI released to El Badrawi 10 of these pages in redacted form, and withheld in full the remaining 40 pages. Id. The FBI argues that because these pages were technically produced under a separate FOIA request than the main request El Badrawi submitted to FBIHQ in October 2006, the court should not address the New Haven documents in this case. This argument unpersuasive. The parties are the same, the interests of the parties are the same, and the issues in dispute are the same. Consequently, in the interests of justice, timeliness, and judicial economy, the court will address the response of the New Haven field office in, infra, Part III(C)(3) at 45.

nonconclusory" standard because it does not justify searching only the CRS database.[15]

Specifically, Hardy's statement that, "the FBI has conducted a search reasonable [sic] designed to yield documents responsive to plaintiff's request directed to FBIHQ" is conclusory.  Id. at 9.  The declaration offers no detail to support this statement, other than a mere description of the CRS database.  Further, as discussed earlier, El Badrawi has identified–and the government has acknowledged–at least one responsive record located in another FBI database, the NCIC.  See, supra, Part II(B)(3) at 9.  The FBI's failure to give detailed justifications for not searching the NCIC, or any other databases it may own or have access to, falls below the standard for "relatively detailed and nonconclusory" affidavits required to legitimate a summary judgment ruling on the adequacy of an agency's search.  Consequently, FBI has not met its burden of proving that it conducted a reasonable search as a matter of law, and El Badrawi is permitted limited discovery on that issue.

      4.  ICE

      By letter dated October 19, 2006, El Badrawi submitted a request for:

> Access to and copies of any record held by ICE mentioning or concerning [himself], including, but not limited to: 1) Mr. El Badrawi's investigations file; 2) records concerning his arrest on a warrant issued on October 28, 2004; 3) records concerning treatment and detention between his arrest and his hearing before an administrative law judge on November 10, 2004; 4) records concerning treatment and detention between the issuance of a notice of voluntary departure on November 20, 2004 and his removal from the United States; and 5) the prosecutor's file used in any and all of his immigration proceedings, including removal and custody proceedings.

---

[15]The plaintiff claims the FBI is not entitled to summary judgment on the adequacy of its search for numerous other reasons.  See Plaintiff's Mem. in Opp. to FBI at 9-14.  Because the declaration is insufficient on the ground discussed herein, it is unnecessary for the court to consider El Badrawi's other claims.

Exhibit B to the Declaration of Gloria Marshall ("Marshall Decl.").  ICE moves for

summary judgment as to the adequacy of the search it undertook in response to this

request.

In support of its Motion for Summary Judgment (Doc. No. 39), ICE submitted the

declaration of Gloria L. Marshall, Unit Chief of the Information Disclosure Unit ("IDU"),

Mission Support Division, Office of Investigations ("OI"), GS-15, ICE within DHS.  In her

declaration, Marshall states that her official duties and responsibilities "include the

general management, oversight, and supervision of the IDU, which includes the

Freedom of Information Act/Privacy Act ("FOIA/PA") Section."  Marshall Decl. at 2.  She

states that she is "familiar with [El Badrawi's] request for information from ICE, pursuant

to the FOIA," and that "the statements contained in [her] declaration are based on [her]

personal knowledge and experience, review of documents kept in the course of

business, and information conveyed to [her] by other ICE employees in the course of

[her] official duties."  Id.

Regarding ICE's search for documents responsive to El Badrawi's request,

Marshall declares that:

> The searches ICE conducted in this case were reasonably designed and conducted
> to uncover the records responsive to [El Badrawi's] FOIA request.  ICE personnel
> with knowledge of the investigation of [El Badrawi] and his subsequent detention
> and removal assisted in identifying relevant files.  All files likely to contain
> responsive records were searched using methods which were reasonably expected
> to produce the information requested.

Id. at 11.  Marshall also provides a time line of events relating to ICE's search,

beginning with a FOIA request submitted to ICE by El Badrawi's counsel as part of a

separate matter,[16] and ending with ICE's February 13, 2008 second supplemental release of documents to El Badrawi.  <u>Id.</u> at 4-11.  This time line references two databases searched by ICE, TECS and NSEERS, and notes a series of other lines of inquiry undertaken by ICE, including a search for records related to El Badrawi's ALR and a request for documents from the Hartford Correctional Center.  <u>Id.</u>

The Marshall declaration is insufficient on two grounds.[17]  It fails to meet the "relatively detailed and nonconclusory" standard because: 1) it does not "describe at least generally the structure of the agency's file system" which renders any further search unlikely to disclose additional relevant information, <u>Church of Scientology</u>, 792 F.2d at 150; <u>Katzman</u>, 903 F. Supp. at 438; and 2) because it does not justify searching only the TECS and NSEERS databases.

First, as discussed above, agency affidavits describing a search "must detail files searched and the general scheme of the agency file system."  <u>Fisher v. FBI</u>, 94 F. Supp. 2d 213, 218 n.2 (D. Conn. 2000); <u>see</u> <u>also</u> <u>Dinsio v. FBI</u>, 445 F. Supp. 2d 305, 312 (W.D.N.Y. 2006); <u>Rabin v. United States Dep't of State, CIA</u>, 980 F. Supp. 116, 120 (E.D.N.Y. 1997).  The Marshall declaration contains no description of ICE's general filing scheme whatsoever, only a time line of events related to the processing of El Badrawi's FOIA case.  In fact, if a requester were to attempt to discern ICE's record maintenance system by relying solely on the time line recounted in the Marshall

---

[16]See the discussion of <u>Lowenstein</u>, <u>supra</u>, n.6.

[17]The plaintiff claims ICE is not entitled to summary judgment on the adequacy of its search for numerous other reasons.  <u>See</u> Plaintiff's Mem. in Opp. to ICE at 10-15.  Because the declaration is insufficient on the grounds discussed herein, it is unnecessary for the court to consider El Badrawi's other claims.

declaration, the requester would have no choice but to conclude that ICE has no system.  Clearly, El Badrawi has no basis upon which to dispute ICE's assertion that any further search is unlikely to disclose additional relevant information.  See Katzman, 903 F. Supp. at 438.   This lack of disclosure impedes El Badrawi's ability to advocate his position and falls well short of the "relatively detailed and nonconclusory" standard adopted by the Second Circuit.  Grand Cent. P'ship., Inc., 166 F.3d at 489.

Second, the Marshall declaration is insufficiently detailed because it fails to explain why, of all its potentially relevant databases, ICE chose to search only TECS and NSEERS.  An "agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested."  Oglesby, 920 F.2d at 68.  The declaration offers only a cursory description of TECS, followed by a passing mention of NSEERS.  Id. at 5-7.  The declaration does not aver that these are the only ICE databases likely to contain responsive documents, nor does it offer any evidence that would justify such a conclusion.  Moreover, El Badrawi has identified at least one other ICE database likely to have records mentioning El Badrawi.  Specifically, the Deportable Alien Control System ("DACS") is a DHS case management system that contains biographical and immigration court proceeding information, and is used to track an alien's immigration case through the removal process.  Plaintiff's Mem. in Opp. to ICE at 14.  ICE has never described DACS in any of its submissions, nor has it justified its failure to search this database for responsive records.  ICE's failure to give detailed justifications for not searching the DACS database, and any other databases it may own or have access to, falls below the standard for relatively detailed and nonconclusory affidavits required to legitimate a summary judgment ruling.

29

In sum, Marshall's assurance that "all files likely to contain responsive records were searched using methods which were reasonably expected to produce the information requested" is conclusory and unsupported by the remainder of the declaration. ICE has not met its burden of proving that it conducted a reasonable search as a matter of law, and consequently its Motion for Summary Judgment is denied as to the adequacy of its search. El Badrawi is permitted limited discovery on the issue.

5. CIS

In his October 19, 2006 FOIA request to CIS, El Badrawi sought:

> Access to and copies of any record held by [CIS] mentioning or concerning [himself] . . . including but not limited to: 1) Mr. El Badrawi's complete Alien File ("A-File"); 2) any and all files related to a petition for an H1-B visa submitted on Mr. El Badrawi's behalf, valid from 12/28/1999 to 10/01/2002 . . . ; 3) any and all files related to a petition for an H1-B visa submitted on Mr. El Badrawi's behalf, valid from 5/26/2003 to 5/1/2004 . . . ; 4) any and all files related to any other petition for an H1-B visa submitted on Mr. El Badrawi's behalf . . . ; 5) any and all files related to any application for an extension of Mr. El Badrawi's H1-B visa dated March 31, 2004 . . . ; 6) any and all files related to the revocation of Mr. El Badrawi's visa on October 2, 2003; and 7) any information contained in the National Automated Immigration Lookout System.

Exhibit A to the Declaration of Brian J. Welsh ("Welsh Decl."). CIS moves for summary judgment as to the adequacy of the search it undertook in response to this request.

In support of its Motion for Summary Judgment (Doc. No. 57), CIS submitted the declaration of Brian J. Welsh, Assistant Center Director in the Freedom of Information and Privacy Acts ("FOIA/PA") Unit, CIS National Records Center ("NRC") in Lee's Summit, Missouri. In his declaration, Welsh states that, "as a FOIA Officer for the NRC since 2006, [he has] supervised the performance of over 100 access professionals in the processing of more than 100,000 FOIA/PA requests received by the USCIS on

average annually."  Welsh Decl. at 2.  In his official capacity as Assistant Center

Director, inter alia, Welsh supervises the personnel "responsible for the orderly

processing of all public, congressional, judicial, and inter-/intra-agency requests or

demands for access to USCIS records and information pursuant to the FOIA . . ."  Id.

Welsh further states that he is "familiar with [El Badrawi's] current civil action under the

FOIA and all events leading to the same."  Id.  Welsh makes the statements in his

declaration "based upon [his] personal knowledge, upon information made available to

[him] in [his] official capacity, and upon conclusions and determinations reached in

accordance therewith."  Id.

With regard to the CIS search itself, Welsh states that "[b]ased upon plaintiff's

name, alien number, and description of requested records, on October 27, 2006, the

NRC conducted a general search for responsive records in the agency's system of

records referred to as Alien File/Central Index System ("A-File/CIS") . . . ."  Id. at 4.

According to the Welsh declaration, "the A-file/CIS is a centralized and

consolidated electronic system of records through which A-files are stored, maintained,

updated, tracked, and received."  Id. at 2 n.2.  Moreover, "all official records generated

or held by U.S. immigration authorities pertaining to INA transactions involving [El

Badrawi] should, as a matter of course, be consolidated in an A-file maintained under,

and retrievable by reference to, [El Badrawi's] name, alien registration number, and

date of birth, or a combination thereof."  Id.

Welsh also gives a brief description of the Computer Linked Application

Information Management System ("CLAIMS"), a CIS database that assigns unique

receipt numbers to documents filed with CIS.  Id. at 5 n.3.  These receipt files are often

31

incorporated into the filer's A-file.  Id.  In response to El Badrawi's FOIA request, CIS

"expected to find at least four separate receipt files incorporated into [his] A-file by

virtue of his initiation of certain immigration transactions, as described in his initial FOIA

request letter, as well as due to certain notations found in [his] A-file."  Id.  CIS located

three receipt files, but despite "conducting a diligent search to locate" the fourth file, to

date CIS has not found it.  Id. at 5.

   The Welsh declaration is insufficient on two grounds.[18]  It fails to meet the

"relatively detailed and nonconclusory" standard because: 1) it does not "describe at

least generally the structure of the agency's file system" which renders any further

search unlikely to disclose additional relevant information, Church of Scientology, 792

F.2d at 150; Katzman, 903 F. Supp. at 438; and 2) because it does not justify searching

only the A-file/CIS and CLAIMS databases.

   As previously noted, agency affidavits describing a search "must detail files

searched and the general scheme of the agency file system."  Fisher v. FBI, 94 F.

Supp. 2d 213, 218 n.2 (D. Conn. 2000); see also Dinsio v. FBI, 445 F. Supp. 2d 305,

312 (W.D.N.Y. 2006); Rabin v. United States Dep't of State, CIA, 980 F. Supp. 116, 120

(E.D.N.Y. 1997).  The Welsh declaration lacks such detail.  That is, while Welsh

provides a cursory description of the path an application/petition takes through the

CLAIMS and A-file/CIS databases, he does not declare–nor does he suggest–that

these are the only two databases owned by CIS.  See id. at 4-5.  Welsh's statement

---

[18]The plaintiff claims CIS is not entitled to summary judgment on the adequacy of its search for
numerous other reasons.  See Plaintiff's Mem. in Opp. to CIS at 8-12.  Because the declaration is
insufficient on the grounds discussed herein, it is unnecessary for the court to consider El Badrawi's other
claims.

that "all official records generated or held by [CIS] . . . involving [El Badrawi] should, as a matter of course, be consolidated in an A-file," is simply not enough detail. It is impossible to conclude, based on this statement, that no CIS database save A-file/CIS or CLAIMS contains records responsive to El Badrawi's request. In other words, El Badrawi has no basis upon which to dispute CIS's assertion that any further search is unlikely to disclose additional relevant information. See Katzman, 903 F. Supp. at 438. As a result, neither El Badrawi nor this court can fairly assess the adequacy of the CIS search.

Second, the Welsh declaration fails because it does not explain why, of all its potentially relevant databases, CIS chose to search only A-file/CIS and CLAIMS. As previously discussed, an "agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested." Oglesby, 920 F.2d at 68. The Welsh declaration offers an extremely brief survey of A-file/CIS, and devotes only one sentence to CLAIMS. Id. at 5-7. More importantly, the declaration does not aver that these are the only CIS databases likely to contain responsive documents, nor does it offer any evidence that would justify such a conclusion. Quite the contrary, Welsh notes that, in fact, "for a myriad of reasons, not all adjudicated receipts will be incorporated into A-files." Id. at 5 n.5. CIS's inability to locate the fourth receipt file relating to El Badrawi is further evidence that not all responsive documents are contained in the A-file/CIS or CLAIMS databases, casting further doubt on the Welsh declaration's conclusory assertion that "all official records [pertaining to El Badrawi] should . . . be consolidated in an A-file." See id. at 4-5.

For these reasons, CIS has not met its burden of proving that it conducted a

33

reasonable search as a matter of law, and therefore is not entitled to summary judgment on the adequacy of its search.  El Badrawi is permitted limited discovery on the issue.

> B.      Reasonableness of Referrals to Originating Agencies

The agencies have, as discussed above, referred certain documents to one another for review and direct response to El Badrawi.  See, supra, Part II(B) at 6-8, 11-12.  In each case of referral, the referring agency determined that the record was responsive, but that the information contained in the record originated with another agency.  See, e.g., ICE Mem. at 15-16.  Referred documents have essentially been treated by the originating agencies in much the same way as that agency's other records: some were released in full, some were released in part, and some were withheld.  See, supra, Part II(B) at 6-7, 11-12. The defendants have moved for summary judgment as to the reasonableness of these referrals.

When an agency receives a FOIA request for documents in its possession, it "cannot simply refuse to act on the ground that the documents originated elsewhere." McGehee v. C.I.A., 697 F.2d 1095, 1110 (D.C. Cir. 1983).  An agency may, however, adopt procedures by which documents in the agency's possession, but which originated with another agency, may be referred to the originating agency for review and direct response to the requester.  See id.  The legal status of such procedures is "best determined on the basis of their consequences."  Id.  In other words, "a system adopted by an agency for dealing with documents of a particular kind constitutes 'withholding' of those documents if its net effect is significantly to impair the requester's ability to obtain the records or significantly to increase the amount of time he must wait to obtain them."

Id.

There is no indication that the defendants' referral of documents to the documents' originating agencies "impaired [El Badrawi's] ability to obtain the records" or "significantly increased the amount of time" he waited to obtain them.  Id.  Aside from the unavoidable delay presumably caused by transferring records from one agency to another, there is no indication that referral itself has prejudiced El Badrawi.  In other words, to the extent El Badrawi claims his ability to obtain the referred records has been impaired, his claim is based on the insufficiency of the originating agencies' Vaughn affidavits and their improper invocation of FOIA's statutory exemptions.  He has not alleged that the referrals per se constitute an improper withholding, nor has he offered any evidence that would suggest as much.  In fact, it appears that El Badrawi does not contest the reasonableness of the defendants' referrals at all.  Consequently, the defendants are granted summary judgment as to the propriety and reasonableness of their referrals of certain records to the records' originating agencies.

        C.      Exemptions

        The defendants have moved for summary judgment on the propriety of their withholdings under a number of the nine statutory exemptions to FOIA's general rule of disclosure.  See 5 U.S.C. § 552(b).  The disposition of these Motions necessarily involves two questions: 1) have the agencies provided sufficient detail and explanation for their withholdings so that the plaintiff and the court can evaluate the propriety of the application of the exemptions invoked?; and if so, 2) have the agencies properly applied the exemptions in question?

        During the course of ordinary litigation, "the facts relevant to a dispute are more

35

or less equally available to adverse parties." <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir.

1973). "In a case arising under the FOIA," however, "this is not true . . . and hence the

typical process of dispute resolution is impossible." <u>Id.</u> Consequently, "affidavits

submitted by a governmental agency in justification for its exemption claims must

therefore strive to correct, however, imperfectly, the asymmetrical distribution of

knowledge that characterizes FOIA litigation." <u>King v. United States Dep't of Justice</u>,

830 F.2d 210, 218 (D.C. Cir. 1987).

"[W]hen an agency seeks to withhold information, it must provide a relatively

detailed justification, specifically identifying the reasons why a particular exemption is

relevant and correlating those claims with the particular part of a withheld document to

which they apply." <u>Morley v. CIA</u>, 508 F.3d 1108, 1122 (D.C. Cir. 2007) (internal

quotations omitted). This justification typically takes the form of a <u>Vaughn</u> index,

named for the case that introduced it. <u>See</u> <u>Vaughn</u>, 484 F.2d at 820 ("an agency's

response to a FOIA request must include an index of all material withheld in whole or in

part"). "The <u>Vaughn</u> index must explain specifically which of the nine statutory

exemptions to FOIA's general rule of disclosure supports the agency's decision to

withhold a requested document or to delete information from a released document."

<u>Founding Church of Scientology, Inc. v. Bell</u>, 603 F.2d 945, 947 (D.C. Cir. 1979).

Courts have observed repeatedly that "the <u>Vaughn</u> index is critical to effective

enforcement of FOIA." <u>Id.</u> "Without such an index neither reviewing courts nor

individuals seeking agency records can evaluate an agency's response to a request for

government records." <u>Id.</u>

Furthermore, the Second Circuit has established standards for the level of detail

required of a <u>Vaughn</u> index. A <u>Vaughn</u> index must provide "information that is not only specific enough to obviate the need for an <u>in camera</u> review, but that also enables the court to review the agency's claimed redactions without having to pull the contextual information out of the redacted documents for itself." <u>Halpern</u>, 181 F.3d at 294. Finally, it is important to note that a "[c]ategorical description of redacted material coupled with categorical indication of anticipated consequences of disclosure is clearly inadequate." <u>Morley</u>, 508 F.3d at 1122.

  1. <u>CBP</u>

   CBP withholds documents under five FOIA exemptions: Exemptions 2 ("low 2" and "high 2"), 3, 6, 7(C), and 7(E).[19] El Badrawi does not contest the propriety of the withholdings under Exemptions "low 2," 6, and 7(C). Thus, only the withholdings under Exemptions "high 2," 3, and 7(E) are at issue.

   Exemption 3 pertains to information "specifically exempted from disclosure by statute . . . provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). CBP has withheld information from one record (Exh. A-1 to Suzuki Decl.), pursuant to § 222(f) of the Immigration and Nationality Act ("INA"), codified at 8 U.S.C. § 1202(f), which exempts from disclosure documents "pertaining to the issuance or refusal of visas or permits to enter the United States." Because this

---

[19]The FOIA exemptions, 5 U.S.C. § 552(b), will be referred to by their subpart. For example, the exemption for information relating to internal personnel rules and practices of an agency found under 5 U.S.C. § 552(b)(2) is referred to as "Exemption 2."

record was created after El Badrawi's visa was already issued, however, it likely concerns the revocation of his visa and not the issuance or refusal of a visa. See Plaintiff's Mem. in Opp. to CBP at 29. The question before the court, then, is whether 8 U.S.C. § 1202(f) applies to a visa revocation.

The question is one of statutory interpretation. In construing 8 U.S.C. § 1202(f) , this court will follow the approach taken by the Supreme Court and the Second Circuit, and "presume that a legislature says in a statute what it means and means in a statute what it says there." Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-254 (1992); see also A. Michael's Piano, Inc. v. FTC, 18 F.3d 138, 143 (2d Cir. 1994) (holding that in order to determine legislative purpose, the court will "look[ ] to the plain language of the statute and its legislative histor[y]").

Relying solely on the plain language of the statute and the interpretive doctrine of expressio unius,[20] the statute cannot be read to apply to visa revocations. That is, while both "issuance" and "refusal" of visas are explicitly mentioned, "revocation" is not. See 8 U.S.C. § 1202(f). Clearly, the issuance of, or the refusal to issue, a visa is not a revocation. Thus, on the plain language of the statute, records pertaining to visa revocation are not protected under the INA, and CBP improperly withheld information under Exemption 3.

Even if the court were to look past the plain language of the statute, however, the

---

[20]Application of expressio unius est exclusio alterius, a Latin maxim signifying the principle that the explicit inclusion of certain items is the implicit exclusion of others, is proper where "the statute identifies a series of two or more terms or things that should be understood to go hand in hand, thus raising the inference that a similar unlisted term was deliberately excluded." Frank G. v. Bd. of Educ., 459 F.3d 356, 370 (2d Cir. 2006)

legislative history of the INA generally confirms this reading.[21]  When the 104th Congress

passed the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), a bill

amending the INA (including § 222), it continued to treat visa revocations separately

from issuances and refusals.  See Pub. L. 108-458, 118 Stat. 3638.  For example, §

5304 of that Act, entitled "Revocation of Visas and Other Travel Documentation," can

be contrasted with § 5302, "Visa Application Requirements."  Id.  The fact that the two

procedures are addressed in distinct sections of the legislation evidences an intent on

the part of the lawmakers that visa revocation be treated as distinct from visa

application (i.e., issuance or refusal of visas).  Beyond mere titles, however, the

legislation made discrete distinctions substantively.  See Pub. L. 108-458 § 5304, 118

Stat. 3638, 3736 (changing judicial review for visa revocation, but not for issuance or

denial).  This clear legislative intent, when read with the plain language of the statute,

leads to the conclusion that 8 U.S.C. § 1202(f) does not apply to visa revocation.

Consequently, CBP's Motion for Summary Judgment is denied with respect to its

invocation of Exemption 3.

Exemption 2 excludes from FOIA's general disclosure requirement "matters that

are related solely to the internal personnel rules and practices of an agency."  5 U.S.C.

§ 552(b)(2).  More specifically, it relates to information concerning "those rules and

practices that affect the internal workings of an agency and therefore would be of no

genuine public interest."  Massey v. FBI, 3 F.3d 620, 622 (2d Cir. 1993) (citations and

---

[21]As El Badrawi rightly notes, the first place to look for legislative history of the INA is its initial passage by the 82nd Congress in 1952, not subsequent amendments.  Reports from the 82nd Congress, however, do not discuss the relationship between visa revocation and visa issuance/refusal, and thus are of little help.  See Conf. Rep. 82-2096, 1952 U.S.C.C.A.N. 1753; H.R. Rep. 82-1365, 1952 U.S.C.C.A.N. 1653.

internal quotations omitted).

Courts have divided Exemption 2 into two categories. A "high 2" exemption involves personnel rules and practices that are of no public interest or that risk of circumvention of the law, while a "low 2" exemption relates to trivial, agency-internal administrative matters. See Founding Church of Scientology, Inc. v. Smith, 721 F.2d 828, 831 (D.C. Cir. 1983) (establishing a two-step test for Exemption 2 applicability). CBP invokes the "high 2" exemption on seven records. Suzuki Decl., Exhs. A, A1, A2, A3; Supp. Suzuki Decl., Exhs. 1, 2.

For each of the documents withheld under the "high 2" exemption, the Vaughn indices state:

> Information withheld in part pursuant to Exemption (b)(2) – internal rules and practices of the agency (both "low 2" – internal matters of a relatively trivial nature and "high 2" – more substantial internal matters, the disclosure of which would risk circumvention of a legal requirement) – under "high 2," information withheld pertains to instructions to individual officers on how to process passengers, and, [sic] the release of such information would reveal law enforcement procedures and techniques.

——

Suzuki Decl., Exh. A at 1-3; Supp. Suzuki Decl., Exh. 1 at 4-8. CBP's supporting declarations provide little additional detail. See Suzuki Decl. at 8; Supp. Suzuki Decl. at 5.

These submissions are not sufficient. CBP's Vaughn index does not provide adequate detail for El Badrawi to contest statements made in the Suzuki declarations in an "adversarial fashion," nor for this court to "engage in an effective de novo review" of CBP's redactions. Halpern, 181 F.3d at 293. Rather, it offers conclusory assertions, restatements of statutory language and case law, and boilerplate warnings about

"jeopardizing" databases and "revealing law enforcement procedures." Such material lacks the detailed explanations necessary to meet the Second Circuit's "reasonable specificity" standard. Grand Cent. P'ship., Inc., 166 F.3d at 489. As a result, the court does not have enough information to determine whether the exemption has been properly applied, and CBP's Motion for Summary Judgment as to the invocation of Exemption 2 is denied.

Similarly, CBP provides insufficient explanations for information withheld under Exemption 7(E), which concerns the disclosure of "techniques and procedures for law enforcement investigations or prosecutions, or [disclosure of] . . . guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(e). CBP redacted seven documents under this exemption. Exhs. A, A-1, A-2, A-3 to Suzuki Decl.; Exhs. 1, 2 to Supp. Suzuki Decl. The corresponding Vaughn indices merely restate statutory language and case law, and lack the specificity necessary for the court to engage in de novo review. Specifically, the justifications are devoid of any nonconclusory indication of the nature of the information redacted, or why release of that information could reasonably be expected to risk circumvention of the law. In other words, the indices and affidavits do not "apply the terms of [section 7(E)] to the specific facts of the documents at hand." Halpern, 181 F.3d at 293. For these reasons, summary judgment is denied as to the propriety of CBP's invocation of Exemption 7(E).

When agency affidavits and Vaughn indices fail to meet standards, a "district court will have a number of options for eliciting further detail from the government. It may require supplemental Vaughn affidavits or may permit appellant further discovery.

. . . [Or] may, in its discretion, order <u>in camera</u> review of the unredacted documents themselves." <u>Id.</u> at 295. The court finds that in the present case, <u>in camera</u> review is appropriate.

It bears noting that "<u>in camera</u> review is considered the exception, not the rule." <u>Local 3, Int'l Bhd. Of Elec. Workers, AFL-CIO, v. NLRB</u>, 845 F.2d 1177, 1180 (2d Cir. 1988). The court recognizes that <u>in camera</u> review should not be resorted to lightly, nor is it a substitute for the agencies' burden of proof. <u>See</u> <u>Halpern</u>, 181 F.3d at 295. In this case, however, the El Badrawi has specifically asked for <u>in camera</u> review, <u>see</u>, <u>e.g.</u>, Plaintiff's Mem. in Opp. to CIS at 1, and at oral argument, the government conceded the appropriateness of <u>in camera</u> review to the extent the court finds defendants' submissions insufficient.

Further, the other options available to the court are unhelpful. El Badrawi first submitted his FOIA requests to defendants in October 2006. Since then, CBP has had nearly two years to submit, in a comprehensive manner, sufficient affidavits and <u>Vaughn</u> indices justifying any information withheld from El Badrawi. The agency has failed to do so. Rather, as discussed herein, the agency has submitted, piecemeal, a series of declarations, supplemental declarations, second supplemental declarations, <u>Vaughn</u> indices, and supplemental <u>Vaughn</u> indices, that have often raised more questions than they have answered.

The court recognizes that much of the delay in this case cannot be blamed solely on the defendants, but the disjointed and seemingly disorganized fashion in which the agencies responded to El Badrawi's FOIA requests can be. For example, there is simply no reason the FBI should be filing a supplemental declaration (Doc. No. 95)

mere hours before oral argument when the declaration could have been made months ago. Such conduct leaves the court with little faith that the agencies will timely submit comprehensive and sufficiently detailed affidavits, even if specifically ordered to do so. See also Order Denying Motion to Reconsider (Doc. No. 107). For this reason, the court finds that in camera assessment of the withheld documents will best allow it to timely make the de novo review the law requires. CBP will submit to the court all records withheld in full or in part for in camera review.

2. DOS

_____DOS withholds information under Exemptions 1 and 3. Because DOS invokes Exemption 3 to withhold records relating to El Badrawi's visa revocation in reliance on the same statute upon which CBP relied, namely, § 222(f) of the INA, codified at 8 U.S.C. § 1202(f), the analysis is identical to that undertaken above. Thus, DOS's Motion for Summary Judgment is likewise denied as to all information concerning El Badrawi's visa revocation withheld under Exemption 3. See, supra, Part III(C)(1) at 37-39.

Exemption 1 protects from FOIA's general policy of disclosure information that is both, "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy[;] and (B) . . . properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). DOS invokes Exemption 1 as to one document, document E7, which it also withheld under Exemption 3. Specifically, DOS withholds document E7 under sections 1.4(b), 1.4(C), and 1.4(d) of Executive Order ("E.O.") 13,292, 68 Fed. Reg. 15,317. These sections authorize the classification of "foreign government information," "intelligence activities

43

(including special activities), intelligence sources or methods, or cryptology," and "foreign relations or foreign activities of the United States, including confidential sources," respectively.  Id.

"[A]n agency affidavit invoking Exemption 1 must provide detailed and specific information demonstrating both why the material has been kept secret and why such secrecy is allowed by the terms of an existing executive order."  N.Y. Times Co. v. United States DOD, 499 F. Supp. 2d 501, 510 (S.D.N.Y. 2007) (citation omitted). Further, as the Second Circuit has held, "under Exemption 1, it makes sense to require itemized descriptions of documents and/or redactions in the government's Vaughn affidavits since these descriptions are likely to have a direct bearing on the types of information contained in the document that are subject to redaction." Halpern, 181 F.3d at 297.

_____The Grafeld declaration submitted by DOS in support of its invocation of Exemption 1 does not meet the standards set forth in N.Y. Times Co. and Halpern. Specifically, the Grafeld declaration asserts that document E7 "was obtained in confidence from a foreign government," and that it "contains information relating to intelligence sources and methods."  Grafeld Decl. at 29.  Thus, it merely restates the standards promulgated in E.O. 13,292.  The declaration goes on to note that "release of this information would hinder the ability to obtain such information in the future and damage relations with the government concerned."  Id.  Such a statement is conclusory. It does not provide sufficiently detailed and specific information as to why the information would hinder the ability to obtain such information in the future or why such secrecy is allowed by the terms of the executive order.  Most importantly, it does not

allow the court to engage in a <u>de novo</u> review of the propriety of the withholding. Therefore, DOS's Motion for Summary Judgment is denied as to all information withheld under Exemption 1. For the reasons noted above, DOS will submit for the court's <u>in camera</u> review all documents withheld in full or in part.

      3. <u>FBI</u>

      There are two separate issues concerning the FBI's reply to El Badrawi's FOIA requests that must be examined: 1) the <u>Glomar</u> response as to VGTOF records; and 2) the general response as to the non-NCIC records. The issues will be addressed in turn.

      It is undisputed that VGTOF is an FBI database within the NCIC containing records relating to persons suspected of violent gang or terrorist affiliations/activities. The FBI refuses to confirm or deny the existence of responsive records in this database, relying on Exemptions 2 and 7(E). Del Greco Decl. at 6. Specifically, it argues that requiring a substantive response to a FOIA request for VGTOF records would force the FBI to reveal whether a requester is of investigative interest. In turn, the agency contends, this would allow a violent gang or terrorist organization to determine which of its members/affiliates had been detected and which had not, thereby facilitating the group's illicit activities.

      El Badrawi argues that a <u>Glomar</u> response is inappropriate in this case because, for a number of reasons, the fact that El Badrawi is in VGTOF is public knowledge. <u>See</u> Plaintiff's Response to Declaration of Del Greco (Doc. No. 103) at 2. Further, he argues that Exemptions 2 and 7(E) do not apply to VGTOF files because any law enforcement techniques and procedures contained in VGTOF have been publicly disclosed by the government, in public meetings of the FBI Criminal Justice Information

45

Services Division Advisory Policy Board ("APB"), through publicly available records relating to the NCIC and its operation, and through public testimony before Congress by FBI officials and other public statements by law enforcement officials. Id. at 6. El Badrawi supports these allegations with declarations, meeting minutes, and a copy of the VGTOF chapter of the 2000 NCIC Operation Manual (previously released by the FBI). See id., Exhibits BB, CC, DD. The declarations submitted by the FBI do not address El Badrawi's arguments.

In light of the evidence brought forth by El Badrawi, the FBI declarations in support of its Glomar response are insufficient. El Badrawi has raised a genuine issue of material fact regarding the propriety of the agency's refusal to confirm or the deny the existence of responsive records in the VGTOF database. The declarations submitted by the FBI do not provide the court sufficient evidence to review, de novo, its assertion that the existence of such records is classified and protected from FOIA's general disclosure requirement by Exemptions 2 and 7(E). Consequently, the FBI's Motion for Summary Judgment is denied as to its Glomar response, and the agency will submit to the court for in camera review: 1) all responsive VGTOF records, if any; and 2) a detailed affidavit as to why the existence/non-existence of such records is, and should be kept, classified.

Regarding the non-NCIC records, the FBI withholds information under Exemptions 1, 2, 6, 7(C), and 7(E). El Badrawi does not contest the FBI's withholdings under Exemptions 6 or 7(C). Thus Exemptions 1, 2, and 7(E) are at issue.

Because the Vaughn indices and supporting affidavits submitted by both FBIHQ and the New Haven field office in justification of these exemptions are essentially

equivalent to those submitted by the DOS and CBP, the analysis of the sufficiency of the detail of those indices and affidavits follows a familiar course. It is therefore unnecessary to repeat the legal standards and itemize the shortcomings of those indices and affidavits. The FBI's Motion for Summary Judgment is denied as to Exemptions 1, 2, and 7(E) because the court is unable to engage in the required <u>de novo</u> review of the propriety of the withholdings without some detailed application of the terms of the exemptions to the specific facts of the records at hand. For the reasons noted above, the FBI will submit for the court's <u>in camera</u> review all documents withheld in full or in part.

4. <u>ICE</u>

ICE withholds information responsive to El Badrawi's request under Exemptions 2, 5, 6, 7(C), 7(D), 7(E), and 7(F). <u>See</u> ICE Mem. at 2. El Badrawi does not contest ICE's withholdings under Exemptions 6 and 7(C). Nor does he contest ICE's withholdings under the "low 2" exemption or many of its withholdings under the "high 2" exemption.

El Badrawi does, however, contest ICE's withholding under Exemption "high 2" of what ICE terms "investigative guidelines, investigative guidelines and directives, and investigative steps taken," ICE <u>Vaughn</u> index, entries for documents 11, 12, 13-16, 19, 20, 22-24, 29-42, 45, 51-55, 104-06, 114-16, 120, 170, 187; "collaborations with other law enforcement agencies," <u>id.</u>, entries for documents 11, 12, 13-16, 19, 20, 22-24, 29-42, 45, 55-51, 1-4-106, 114-16, 120, 170, 187; and "operational procedures," <u>id.</u>, entry for document 88.

"[I]f disclosure significantly risks circumvention of agency regulations or statutes,

47

then Exemption 2 exempts the material from mandatory disclosure.  In all cases in which the Government relies on Exemption 2, it remains the Government's burden to prove the 'significant risk.'"  <u>Crooker v. Bureau of Alcohol, Tobacco & Firearms</u>, 670 F.2d 1051, 1074 (D.C. Cir. 1981).  In support of its withholdings of "investigative guidelines," "investigative guidelines and directives," and "investigative steps taken," ICE asserts that the release of such information would allow criminals to circumvent ICE investigations by assisting them in understanding the "focus and stratification" of the investigations.  <u>See</u> <u>e.g.</u>, ICE <u>Vaughn</u> index, entry for documents 11, 12.  The index provides no further explanation of the type of information withheld under these terms, nor of the manner in which disclosure of the information would assist criminals in circumventing ICE investigations.  Further, because the information withheld is contained in narratives from law enforcement database printouts–some quite lengthy–ICE must provide enough detail in its <u>Vaughn</u> index for the court to determine the propriety of its segregability determinations.  The index lacks such detail, and summary judgment is therefore inappropriate to information withheld as "investigative guidelines," "investigative guidelines and directives," and "investigative steps taken."

ICE withholds information pertaining to collaboration with other law enforcement agencies from 24 documents.  It claims this information falls under FOIA's "high 2" exemption.  To be properly withheld under Exemption 2, information must meet the standard of "predominant internality."  <u>See</u> <u>Schiller v. NLRB</u>, 964 F.2d 1205, 1207 (D.C. Cir. 1992).  In other words, "[p]redominantly internal documents[,] the disclosure of which would risk circumvention of agency statutes and regulations[,] are protected by the so-called 'high 2' exemption."  <u>Id.</u>

ICE has not demonstrated that the information withheld as pertaining to collaboration with other law enforcement agencies is "related solely to [ICE] internal personnel rules and practices." 5 U.S.C. § 552(b)(2). To the contrary, ICE merely claims that the collaboration falls under Exemption 2 without demonstrating how such interagency activity is predominately internal to ICE. Unless ICE establishes the predominant internality of the information, summary judgment is not appropriate. See Sussman v. United States Marshals Serv., 494 F.3d 1106 (D.C. Cir. 2007) (holding that summary judgment was not appropriate because defendants provided no evidence that "information reflecting communications between agencies" was predominately internal).

ICE additionally withholds one record, document 88, under Exemption "high 2" to "protect from disclosure operational procedures" that, "if disclosed, would risk circumvention of the law." ICE Vaughn Index, entry for document 88. Document 88 is described by ICE as a "State of Connecticut Department of Correction Database Printout."

El Badrawi argues that document 88 "likely constitutes El Badrawi's entry in the NCIC," Plaintiff's Mem. in Opp. to ICE at 19, and further that "a separate process before the Connecticut Freedom of Information Commission has found that this document could not be withheld from Mr. El Badrawi." Id. It is not clear to the court, however, that document 88 is plaintiff's NCIC printout. In fact, at oral argument ICE represented that document 88 is not an NCIC document. Further, the court notes that an appeal of the Connecticut Commission's ruling is still pending.[22] The court declines, therefore, to

---

[22]See Danneher v. FOIC, No.HHB-cv-08-4016692-S.

49

order disclosure of the document as requested by El Badrawi.  Yet, because the

Vaughn index entry for document 88 contains insufficient detail for the court to conduct

the required de novo review, summary judgment is denied as to the propriety of

withholding the record under the "high 2" exemption.

ICE withholds information from 30 records under Exemption 5.  See ICE Vaughn

Index.  Exemption 5 shields from disclosure "inter-agency or intra-agency

memorandums or letters which would not be available by law to a party other than an

agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  "Courts have interpreted

Exemption 5 to encompass traditional common-law privileges against disclosure,

including the work-product doctrine, and executive, deliberative process and attorney-

client privileges."  Nat'l Council of La Raza v. DOJ, 411 F.3d 350, 356 (2d Cir. 2005).

ICE claims the deliberative process privilege, the work product doctrine, and attorney-

client privilege.  ICE Mem. at 23.  El Badrawi does not contest the application of the

attorney-client privilege.  Plaintiff's Mem. in Opp. to ICE at 21-22, n. 8.  Thus, records

withheld under the deliberative process privilege and the work product doctrine are at

issue.

The deliberative process privilege attaches only to records that are "(1)

predecisional, i.e., prepared in order to assist an agency decisionmaker in arriving at his

decision, and (2) deliberative, i.e., actually . . . related to the process by which policies

are formulated."  Id. at 356 (internal quotations omitted).  ICE invokes deliberative

process to withhold "records consisting of correspondence and communications which,

for example, discuss the existence of potential violations of law and seek advice and

input regarding an investigation," and also, "drafts and unapproved documents, such as

50

draft Significant Incident Reports that were not later expressly adopted or incorporated by reference into a final report." ICE Mem. at 23. ICE claims that the records "address the existence of potential violations of law and seek advice regarding [investigations]" and therefore "relate to a process to facilitate an agency determination–i.e., are deliberative." Id. at 24.

These assertions, however, display a misunderstanding of the deliberative process privilege. "A document is deliberative when it is actually . . . related to the process by which policies are formulated." Grand Cent. P'ship., Inc., 166 F.3d at 482. In other words, for the privilege to apply, it must be "indicative of the agency's thought processes . . . . Purely factual material not reflecting the agency's deliberative process is not protected." Local 3, International Brotherhood of Electrical Workers v. NLRB, 845 F.2d 1177, 1180 (2d Cir. 1988). Consequently, ICE records consisting of factual information and non-policy-oriented data, such as correspondence seeking advice on potential violations of law, do not fall under Exemption 5 unless agency policy typically arises from such communication. Perhaps this is the case, but ICE makes no such assertion.

Moreover, even if a document is predecisional and deliberative, it will not be protected under Exemption 5 if "the agency has chosen expressly to adopt or incorporate by reference a memorandum previously covered by Exemption 5 in what would otherwise be a final opinion." Nat'l Council of La Raza, 411 F.3d at 356 (internal quotation omitted). In its Vaughn entries for 15 of the 16 records withheld under the deliberative process privilege, ICE does not assert, much less prove, that the record was not adopted as ICE policy. Vaughn index, entries for documents 118-19, 176-77,

178-85, 199-200, 201-02, 203-04, 205-06, 207-09, 210-12, 213-14, 215-16, 217-19, 220-22, 223-24, 225-26.  Lacking this showing, summary judgment is not appropriate as to the propriety of withholding these records.

Likewise, ICE has not asserted, or proven, that the records withheld under the work product doctrine were not adopted as agency policy.  The work product doctrine protects the "files and the mental impressions of an attorney . . . reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways prepared in anticipation of litigation."  A. Michael's Piano, 18 F.3d at 146 (2d Cir. 1994) (internal quotation omitted).  El Badrawi claims the failure to prove that records withheld under the attorney work product doctrine were not adopted by the agency is fatal to ICE's Motion for Summary Judgment.

The Second Circuit has not yet determined whether the rule set forth in Nat'l Council of La Raza concerning the doctrine of adoption and incorporation applies to the attorney work product doctrine, see Wood v. FBI, 432 F.3d 78, 83 (2d Cir. 2005).  In this case, the court may not need to address the issue either, since it appears from the record that there is little likelihood work product related to El Badrawi was adopted into final ICE policy.  However, the court will not so speculate.  Therefore, ICE must submit a supplementary affidavit, for in camera review, stating whether or not the information it withholds under the work product doctrine was incorporated or adopted into ICE policy.

Finally, ICE withholds documents relating to Operation Frontline under Exemptions 7(D), 7(E), and 7(F).  These exemptions apply to records that:

(D) could reasonably be expected to disclose the identity of a confidential source,

52

including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source; (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law; or (F) could reasonably be expected to endanger the life or physical safety of any individual."

ICE claims that, because Operation Frontline implicates national security, this court should "accord deference to executive assessments of harm." ICE Mem. at 34. An agency's declarations are only entitled to deference, however, when "accompanied by reasonably detailed explanations of why material was withheld." Halpern, 181 F.3d at 295.

ICE has not sustained its burden of demonstrating that the material withheld under Exemptions 7(D), 7(E), and 7(F) is exempt from FOIA's general disclosure rule. That is, the agency has not provided reasonably detailed explanations of how disclosing the information could compromise the interests protected by Exemption 7.

In justifying the redaction of material from agency records, it is not enough to rely on vague and conclusory statements. Even where national security implications are involved, the court must have sufficient information to review the agency's withholdings de novo. See Halpern, 181 F.3d at 295. ICE does not provide such information, but rather asserts a string of cryptic and indefinite possibilities whereby terrorists could piece together such abstract information as the gender and nationality data of those targeted by Operation Frontline in such a way as to "reveal both the identities of the confidential sources ICE used and the information provided by the confidential

sources." ICE Mem. at 40.

This court recognizes that "bits and pieces of data may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself," and that "what may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context." CIA v. Sims, 471 U.S. 159, 178 (1985); see also Doe v. Gonzales, 386 F. Supp. 2d 66, 77 (D. Conn. 2005) (noting that, while one piece of information "may appear innocuous by itself, it could still be significant to a terrorist organization when combined with other information available to it"). But the agency must provide the court enough information to reasonably conclude that the instant case implicates such a scenario. In other words, the court's review is not vacuous. See Ctr. for Nat'l Sec. Studies v. United States DOJ, 331 F.3d 918, 940 (D.C. Cir. 2003) (Tatel, J. dissenting). Summary judgment is not appropriate when the court does not have information of sufficient detail to support a finding of proper withholding. Here, ICE has not provided such information. Therefore, ICE's Motion for Summary judgment is denied as to the withholdings under Exemptions 7(D), 7(E), and 7(F).

For the reasons noted above, ICE will submit for the court's in camera review all documents withheld in full or in part under exemptions "high 2," 7(D), 7(E), and 7(F). As previously discussed, it will also submit for in camera review an affidavit stating whether or not information withheld under the work product prong of Exemption 5 was incorporated or adopted into ICE policy.

5. CIS

_____CIS withholds information under Exemptions 2, 5, 6, 7(C), and 7(E). El Badrawi

54

does not contest CIS's withholdings under Exemptions 2 ("low 2"), 6, and 7(C).  See Plaintiff's Mem. in Opp. to CIS at 1 n.1.  Thus, Exemptions "high 2", 5, and 7(E) are at issue.

Because the Vaughn indices and supporting affidavit submitted by CIS in justification of Exemptions 2 and 7(E) are essentially equivalent in form and level of detail to those submitted by the other agency defendants, the analysis of their sufficiency follows a similar course.  The vast majority of CIS's Vaughn indices consist of categorical descriptions of withheld documents, restatements of the statutory language of the FOIA exemptions, and categorical indications of the consequences of disclosing the documents.  In brief, CIS has not applied, in detail, the terms of the exemptions to the specific facts of the records at hand.  Consequently, CIS's Motion for Summary Judgment is denied as to Exemptions 2 and 7(E) because the court is unable to engage in the required de novo review of the propriety of the withholdings.

Finally, with respect to CIS's invocation Exemption 5, CIS relies on the same erroneous understanding of the deliberative process privilege as ICE.  See supra, Part III(C)(4) at 49-51.  Thus, CIS's Motion for Summary Judgment is denied as to Exemption 5.  For the reasons noted above, CIS will submit for the court's in camera review all documents withheld in full or in part.

D.     Reasonableness of Agency Segregability Determinations

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."  5 U.S.C. § 552(b).  See also Donovan v. FBI, 806 F.2d 55, 58 (2d Cir. 1986) (requiring that agencies "segregate their disclosable and

non-disclosable portions").  "This rule of segregation applies to all FOIA exemptions." Sussman v. United States Marshals Serv., 494 F.3d 1106, 1116 (D.C. Cir. 2007). Further, "[b]efore approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld."  Id.

"Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material."  Id. at 1117.  However, "[i]f the requester successfully rebuts this presumption, the burden lies with the government to demonstrate that no segregable, nonexempt portions were withheld."  Id.

Defendants assert that they are entitled to summary judgment on the issue of segregability.  Specifically, they seek a ruling that they have complied with FOIA's mandate to provide all reasonably segregable material to El Badrawi.  In support of their claim they offer a number of statements, culled from the agency affidavits, declaring that records were properly examined for segregability.  See e.g., Marshall Decl. at 23 ("All information not exempted from disclosure pursuant to the FOIA exemptions specified . . .  was correctly segregated and non-exempt portions were released.  Each record partially released was reviewed line by line to determine if there were any portions of the record that could be released.  As indicated in [the Vaughn index], information withheld was individually determined to be exempt from the release").

El Badrawi, on the other hand, argues that the defendants have not satisfied their segregability burden because the affidavits submitted by the agencies do not describe, in a relatively detailed manner, a careful line-by-line review of every record. See e.g., Plaintiff's Mem. in Opp. to ICE at 40 ("Rather than asserting that each responsive record was reviewed, the Marshall Declaration merely asserts that 'each

record partially released' was reviewed for segregability.  The Marshall Declaration therefore does not address whether the records withheld in their entirety were reviewed line by line").

In light of the court's ruling that the defendant's affidavits and <u>Vaughn</u> indices do not meet the requisite level of detail to warrant summary judgment on the invocation of certain FOIA exemptions, the court denies defendant's Motion for Summary Judgment on the issue of segregability as well.  That is, because there exists a genuine dispute as to whether information was correctly withheld, assessing the propriety of the agencies' segregability conclusions would be premature.  If, for example, the court later determines an agency has inappropriately widened the scope of a FOIA exemption–as is currently the case with Exemption 3 as applied to visa revocation records by CBP and DOS–new segregability reviews would be required.

For this reason, the court denies without prejudice the defendants' Motions for Summary Judgment on the issue of segregability.

## IV.  CONCLUSION

The defendants' Motions for Summary Judgment (Doc. Nos. 15, 20, 25, 39, and 57) are **GRANTED** with respect to defendants' invocation of Exemptions "low 2," 6, and 7(C); and **GRANTED** with respect to the reasonableness of defendants' referrals of documents to the documents' originating agencies.  ICE's Motion for Summary Judgment (Doc. No. 39) is further **GRANTED** as to withholdings under the attorney-client privilege of Exemption 5.

The Motions are otherwise **DENIED** as to defendants' invocations of Exemptions

1, "high 2," 3, 5, 7(D), 7(E), and 7(F); **DENIED** as to the adequacy of defendants'

searches; and **DENIED** as to the reasonableness of defendants' segregability

determinations.

Plaintiff will be allowed limited discovery as to the adequacy of defendant's

searches.  See Halpern, 181 F.3d at 295 (noting that when an affidavit fails to meet

standards, a district court "may permit [plaintiff] further discovery").  See also Baker &

Hostetler LLP v. United States DOC, 473 F.3d 312, 317 (D.C. Cir. 2006) (quoting

SafeCard Servs., Inc. v. SEC, 926 F.2d 1197 (D.C. Cir. 1991) for the proposition that a

"district court has broad discretion to manage the scope of discovery in FOIA cases");

Weisberg v. United States Dep't of Justice,627 F.2d 365, 371 (D.C. Cir. 1980) (holding

"[c]ourts have ample authority to protect agencies from oppressive discovery for

example, by limiting the scope of permissible questioning," but cautioning that "the court

becomes unduly restrictive when it bans further investigation while the adequacy of the

search remains in doubt").

With regard to CBP, DOS, FBI, and ICE, this limited discovery will consist solely

of deposing the agency employees who submitted affidavits on behalf of the agencies,

or substitute employees of similar responsibility in the event the declarants are no

longer employed by the agency.[23]  For CIS, however, in addition to the CIS employee

---

[23]The defendants request that, to the extent the court finds discovery appropriate, the court order El Badrawi to submit written interrogatories rather than allow depositions.  Relying on written interrogatories, however, would largely defeat the purpose behind the court's decision to allow further discovery.  Despite multiple rounds of declarations, supplemental declarations, and second supplemental declarations, El Badrawi still has not received sufficient evidence that the agencies have conducted adequate searches in response to requests he submitted in 2006.  Further, given the record in this case, there is no reason to believe additional written communications will be either swift or comprehensive.  El Badrawi now requests the opportunity to take limited depositions, and the court finds such discovery entirely prudent.  The time for interrogatories has long passed.

who submitted affidavits on behalf of the agency (or an employee of similar responsibility in the event the declarant is no longer employed by CIS), plaintiff is also permitted to take the deposition of the one CIS employee most knowledgeable about the whereabouts of the missing fourth receipt file.

Further, as previously discussed, defendants will submit to the court all records withheld in full or in part for in camera review.[24]  See Halpern, 181 F.3d at 295 (noting that "the district court may, in its discretion, order in camera review of the unredacted documents themselves").  Specifically, defendants will separate classified from unclassified records, clearly marking any records requiring special handling. Defendants will then deliver to the court all unclassified records withheld in full or in part by the agencies by **OCTOBER 6, 2008.**  In addition, defendants will, by the same date, make arrangements with the court for review of the classified records.

Following in camera review, the court will order disclosure of information improperly withheld by the agencies, if any, and order the agencies to make supplemental submissions for information properly withheld but currently lacking sufficiently detailed explanations, if any.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 30th day of September, 2008.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge

---

[24]Including documents referred to, and received in referral from, another agency.